FILED 30 APR '13 12:38USDC-ORP

# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON
# PORTLAND DIVISION

Denise Subramaniam, pro se                  Civil Case No. 3:12 – CV – 1681 MO

Plaintiff,

    v.                                      **Plaintiff's Opposition to MGC**

D. Andrew Beal et al                        **Mortgage Inc's Motion to Dismiss**

Defendants

1        **RESPONSE TO LR 7-1 CERTIFICATE OF COMLIANCE**

2        Attorney for MGC Mortgage Inc. (MGC), did not make a good faith effort to resolve the motion

3        via telephone or email. Good faith effort involves a reasonable give and take between parties and a

4        review of pertinent materials and facts; no such give and take occurred.

5        **OPPOSITION TO MOTION**

6        MGC seeks a full dismissal of Plaintiff's Amended Complaint pursuant Federal Rule of Civil

7        Procedure 12(b)(6); and alternately requests its own dismissal from the Counts in which it is named

8        (Counts I, II, VI, and VII). MGC also moves to strike Plaintiff's Amended Complaint pursuant to Rule

9        12(f) or alternatively MGC moves for a more definitive statement pursuant to Rule 12(e), as well as

10      Rules 8 and 9.

11      **Objection to MGC's Exhibits for Judicial Notice in Support of MGC's Motion to Dismiss**

12      Plaintiff objects to MGC's request to take Judicial Notice of "Facts" in their Exhibits A, B, C

13      and D in Support of Defendant MGC Mortgages, Inc's Motion to Dismiss.

14      Plaintiff has claimed in her Amended Complaint that these documents contain omissions,

15      misrepresentations of material fact and forgeries.

1          Plaintiff does not object to the court noticing they were recorded, the date of recording and

2   names of parties. The court may not notice the truth of its content (disputed facts) and (hearsay).

3   *Herrera v. Deutsche Bank National Trust Co. (2011) 196 Cal.App. 4th, 1366, 1375.*

4          Taking judicial notice of a document is not the same as accepting the truth of its contents or

5   accepting a particular interpretation of its meaning.' [Citation] While courts take judicial notice of public

6   records, they do not take notice of the truth of matters stated therein. [Citation] `When judicial notice is

7   taken of a document, . . . the truthfulness and proper interpretation of the document are disputable.'

8   [Citation]" *(Herrera v. Deutsche Bank National Trust Co. (2011)  196 Cal.App.4th 1366, 1375.)*

9   Accordingly, we take judicial notice of the existence of these court documents (Evid. Code, §§ 452,

10  subd. (d), 459, subd. (a)), but do not take notice of the disputed facts in the documents. *Heritage Pac.*

11  *Fin. v. Monroy No.A135274, A136043 (Dist 1-Div 2 - 3/29/13)*

12         In a "motion to dismiss, the material allegations of the complaint are taken as admitted."   From

13  this vantage point courts are reluctant to dismiss complaints unless it appears that plaintiff can prove no

14  set of facts in support of any claim entitling her to relief. *Hartford Fire Ins. Co. v. California, 509 U.S.*

15  *764 , 811 (1993) citing Conley v.Gibson, 355 U.S. 41 (1957) [overruled on other grounds by Davis v.*

16  *Scherer 463 U.S. 183(1984)]*

17         Plaintiff pled plausible facts and viable claims. The issue is not whether Plaintiff will prevail but

18  whether she is entitled to offer evidence to support the asserted claims. *Scheuer v. Rhodes, 416 U.S. 232,*

19  *236 (1974).*

20  **Rule 12(b)(6) Motion Based solely on Statements of Counsel Must be Denied**

21         MGC's motion to dismiss is unsupported by any affidavit. The court must disregard all

22  statements of counsel as inadmissible hearsay--not evidence.

1    "The defendants' motion to dismiss for failure to state a claim unsupported by affidavits or

2    depositions is incomplete because it requests this Court to consider facts outside the record which have

3    not been presented in the form required by Rules 12(b) (6) and 56(c). Statements of counsel in their

4    briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to

5    dismiss or summary judgment" *Trinsey v. Pagliaro, 229 F.Supp. 647, 649 (E. D. PA) (1964).*

6         In 1977 the High Court adopted Trinsey in *United States v. Lovasco, 431 U.S. 783,799 (1977)*;

7    reaffirming it in *Gonzales v. Buist, 224 U.S. 126, 56 L. Ed. 693, 32 S. Ct. 463 (04/01/12).*

8         "This finding of a continuing investigation, which forms the foundation of the majority opinion,

9    comes from statements of counsel made during the appellate process. As we have said of other unsworn

10   statements which were not part of the record, and therefore could not have been considered by the trial

11   court: Manifestly, [such statements] cannot be properly considered by us in the disposition of [a] case."

12   *Adickes v. Kress & Co., 398 U. S. 144, 398U.S.157-158, n. 16.* While I do not question the good faith of

13   Government counsel, it is not the business of appellate courts to make decisions on the basis of unsworn

14   matter not incorporated in a formal record. *United States v. Lavasco*

15        Denying a motion to dismiss in *Gonzales* the Supreme Court concludes:

16        "Under no possible view, however, of the findings we are considering can they be held to

17   constitute a compliance with the statute, since they merely embody conflicting statements of counsel

18   concerning the facts as they suppose them to be and their appreciation of the law which they deem

19   applicable, there being, therefore, no attempt whatever to state the ultimate facts by a consideration of

20   which we would be able to conclude whether or not the judgment was warranted." *Gonzales v. Buist*

21        The above Supreme Court mandates were codified into federal jury instruction 74-1:

22        "What Is and Is Not Evidence

1        The evidence in this case is the sworn testimony of the witnesses, the exhibits received in

2            evidence, stipulations, and judicially noticed facts…Arguments by lawyers are not evidence,

3            because the lawyers are not witnesses. .Model Civil Jury Instruction (9th Cir)"

4        Jury Instruction 74-1 was affirmed by our Supreme Court in *Holt v. United States, 218 U.S. 245,*

5    *54 L. Ed. 1021, 31 S. Ct. 2 (10/31/10).*

6        "No instruction was asked, but, as we have said, the judge told the jury that they were to regard

7    only the evidence admitted   by him, not statements of counsel" *Holt v. U.S.*

8        The court in *Borbon v. City of Tucson, 27 Ariz. App. 550 (1976) 556 P.2d 1153; a rehearing*

9    *petition was denied 10/13/76 and Petition for Review denied 10/16/76* held even uncontroverted factual

10    statements in a moving party's brief may not be relied upon for summary judgment, citing *Trinsey* and

11    Wright & Miller:

12        Summary judgment cannot be granted on the basis of statements of fact in the moving party's

13    brief even though they are uncontroverted by an opponent. *Trinsey v. Pagliaro,229 F.Supp. 647*

14    *(E.D.Pa. 1964); Wright & Miller, Federal Practice and Procedure, Vol. 10, Sec. 2723, p. 489.*

15    Similarly, the court may not take cognizance of positions regarding the facts based upon exhibits that are

16    merely parts of the briefs and have not been otherwise verified or supported. *Goldman v. Summerfield,*

17    *94 U.S.App.D.C. 209, 214 F.2d 858(1954). Borbon v. City of Tucson*

18        Under the Supreme Court directives since *Lavasco* in 1977 the court must disregard MGC's

19    counsel's statements of facts peppered throughout the Rule 12(b)(6) Motion.

20        Even if the court could consider the inadmissible hearsay statements of counsel in the motion

21    most of the statements contradict averments Plaintiff made in a verified complaint. Even if counsel

22    could offer contra affidavits it would only create triable issues of fact. Affidavits cannot be controverted

23    in 12(b)(6) motion as all allegations are admitted true.

1    Counsel for MGC argues that "All the foregoing assignments of Deed of Trust are available from

2    the public land title records." Counsel includes a diagram supporting his argument showing People's

3    Choice Home Loan, Inc (2004) to Homecomings Financial Network, Inc. (GMAC) (2005) to Residential

4    Funding Company, LLC (GMAC) (2006) to LNV Corporation (2008). Counsel further argues,

5    erroneously, "It appears from the face of the land title records and even from Plaintiff's Amended

6    Complaint (p 16, 1. 17 through p. 17, 1.23) that is undisputed that there is no break in the chain of title

7    of the Deed of Trust in the land records."

8    Although Plaintiff does not dispute the "existence" of such public land title records; Plaintiff

9    clearly disputes the validity of these records in her Amended Complaint. Plaintiff also clearly claims a

10    NON-CURABLE BREAK IN THE CHAIN OF TITLE *(see page 16 Line 17 through page 18.)*

11    Plaintiff claims the assignment recorded on June 28, 2006 as document No. 2006-077542 and

12    "allegedly executed on December 29, 2005 whereby People's sells, assigns, transfers, and conveys the

13    Plaintiff's Note and DOT to 'Homecomings Financial Network, Inc.' (hereinafter referred to as

14    'Homecomings.') circumvents the entire sale to EMC that occurred on May 1, 2004. This assignment

15    also occurs within the same month that the Plaintiff's loan was 'paid off' within the BSABS 2004-HE4

16    Trust."

17    Plaintiff further claims: "The first "Notice of Default" which was recorded against the property

18    on June 28, 2006 as Doc. No. 2006-077544 (attached in the county records) states in paragraph 3,

19    "CAL-WESTERN RECONVEYANCE CORPORATION as Trustee, hereby certifies that no

20    assignments of the trust deed by the trustee or by the beneficiary and no appointments of a successor

21    trustee have been made except as recorded in the mortgage records of the county or counties in which

22    the above described real property is situate[d."] This statement confirms that no assignment was ever

23    recorded evidencing a sale from People's to any other Trust entity or the Trust itself. **THIS**

1    **REPRESENTS A NON-CURABLE BREAK IN THE CHAIN OF TITLE.**" This 2006 "Notice of

2    Default" is entered as Plaintiff's Exhibit A. Pertinent verbiage is highlighted.

3              Counsel for MGC admits that "MGC has no knowledge, one way or the other, whether there

4    were past loan servicers, or whether the Loan was placed into a securitized loan pool trust at one time as

5    claimed by Plaintiff."

6              THEREFORE, Counsel for MGC cannot succeed on a motion to dismiss based on facts that are

7    in dispute when he cannot, by his own admission, offer any evidence to the court to disprove Plaintiff's

8    claims of fact. Counsel's argument that whether or not the loan was securitized in the past, or whether

9    there were prior loan servicers "does not affect LNV's title to the Loan and status as beneficiary under

10   the Deed of Trust" cannot prevail because it completely ignores Plaintiff's claim in her Amended

11   Complaint that 1.) The alleged deed of trust was acquired through fraud and therefore is not a negotiable

12   instrument; 2.) An incurable break existed in the chain of title prior to LNV's alleged acquisition of the

13   DOT; 3.) The instrument that allegedly assigns the DOT from Residential Funding Corp. ("RFC") to

14   LNV is void because the prior assignment from Homecomings Financial Network to RFC contains

15   misrepresentations of material fact and forgeries and therefore is void and is not a negotiable instrument.

16             Counsel for MGC admittedly does not know the facts pertaining to the securitization of

17   Plaintiff's mortgage or whether an incurable break in the chain of title exists, yet he asserts as if it were

18   an ultimate and indisputable fact that LNV is the true beneficiary of Plaintiff's DOT. Such an argument

19   is cannot prevail because LNV's standing as a beneficiary depends on the validity of the legal

20   instruments it claims give it that status. LNV cannot resurrect a void DOT simply by alleging an

21   assignment of DOT for an alleged consideration of $10.00.

1      Plaintiff offers the court a qualified expert opinion regarding the beneficiary status of her deed of

2      trust and promissory note. Please refer to the Declaration William J. Paapalo in support of her objection

3      to MGC's motion to dismiss and in support of her Amended Complaint.

4      Counsel for MGC draws conclusions that he expects the court to accept as ultimate fact, when no

5      discovery has occurred and when he has presented no undisputed evidence to support his position; he

6      argues, "Plaintiff has made a number of inflammatory accusations in the Amended Complaint to support

7      her alleged claims (Count 1 for wrongful foreclosure; Count II for conspiracy to mail/wire fraud; Count

8      VI for RICO; Count VII for discrimination). All of Plaintiff's claims are entirely denied by MGC."

9      The first count in Plaintiff's Amended Complaint is **not** for "wrongful foreclosure" but for

10     **Foreclosure Fraud**. No matter how "inflammatory" Counsel for MGC believes Plaintiff's claims are,

11     this is merely his opinion; and if MGC entirely denies her claims then this is, by Counsel's own

12     admission, a dispute. Disputed facts are worthy of discovery and an evidentiary hearing with a jury to

13     determine the ultimate facts; therefore MGC's Motion to Dismiss should be denied.

14     Counsel for MGC also argues that "LNV's status with respect to the Loan and Deed of Trust and

15     MGC's servicing are no more than ordinary course of business transactions at arms' length."

16     However, Plaintiff claims in her Amended Complaint that this is not the case and that the

17     activities of MGC, LNV, Property Acceptance Corporation, Beal Bank and D. Andrew Beal and the

18     multitude of other companies and corporations created by D. Andrew Beal are not "ordinary course of

19     business transactions."

20     MGC contends that Plaintiff's Complaint fails to state any claims upon which relief may be

21     granted. One argument made by both Counsels for MGC and NWTS is that "the trustee's sale was

22     cancelled on September 27, 2012 and the foreclosure never occurred" and that somehow this should

1   dissolve them of liability for compensatory damages which include financial losses, personal injury and

2   mental distress. It does not.

3          On January 15, 2013 a man came to Plaintiff's home and took pictures. (See Plaintiff's Exhibit

4   N.) The extreme prolonged stress Plaintiff has suffered since 2006 because of this ordeal with fraud has

5   caused her considerable personal injury. She was so ill and in so much pain that she was bedridden for

6   most of 2010 and 2011. One of many such injuries is the eruption of painful sores on her scalp. After

7   filing her original complaint in September and after she felt assured that NWTS would not attempt a

8   new trustee's sale without providing notice; in or around around mid-October 2012 until just after

9   January 15, 2013, the sores on Plaintiff's scalp had healed and were completely gone for the first time

10  since 2010. The sores returned shortly after January 15, 2013 when this man began coming to her house.

11  Plaintiff, in addition to an in-camera judicial review of her medical records, can produce witnesses who

12  have knowledge of how her health has been affected by the stress and the constant fear of losing her

13  home to fraud.

14         Please refer to the Affidavit of Denise Subramaniam entered as Exhibit AA.

15  ## The Standard of Review on a Rule 12(b)(6) Motion

16         Counsel for MGC cites *SmileCare Dental Group v. Delta Dental Plan*, in support of his

17  argument for dismissal but *SmileCare* is an antitrust action with little similarity to the Plaintiff's cause of

18  action or claims. He additionally cites *DeLorean Motor Co. v. Weitzman* a bankruptcy case "DeLorean

19  Motor Company ("DMC") filed for bankruptcy... and plaintiff Allard was appointed trustee of DMC

20  (the "Trustee"). On April 13, 1984, the Trustee instituted a fraudulent conveyance action against John Z.

21  DeLorean, Christina F. DeLorean and defendant Weitzman" that doesn't appear similar to the case here.

22         Perhaps because a "fraudulent conveyance action" was claimed he thought it was similar; in any

23  event the Sixth Circuit Court of Appeals denied the motion to dismiss:

1    "A judge may not grant a Fed. R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's

2    factual allegations. Id. While this standard is decidedly liberal, it requires more than the bare assertion of

3    legal conclusions. *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir.1988).* "In

4    practice, `a ... complaint must contain either direct or inferential allegations respecting all the material

5    elements to sustain a recovery under some viable legal theory.'" Id. (*quoting Car Carriers, Inc. v. Ford*

6    *Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d*

7    *821 (1985) (quoting In re Plywood Antitrust Litigation, 655 F.2d 627, 641 (5th Cir.1981)).* Applying

8    these standards, we hold that the complaint withstands the motion to dismiss on both counts.... Given

9    that a section 105(a) injunction may issue against an action, in a non-appointing forum, that threatens the

10   integrity of the estate, the Trustee has clearly stated a claim upon which relief may be granted. The

11   Trustee is entitled to offer his proof supporting these allegations that the Weitzman Action would unduly

12   hinder the administration of the estate. The District Court erred in dismissing this claim for failure to

13   state a claim."

14         Counsel for MGC cited *Holden v. Hagopian* a complex partnership related action alleging

15   violations of the Securities Act of 1933 ("the 1933 Act"); this case is not similar to the case at hand.

16         *Rapacki v. Chase Home Finance LLC* is a breach of contract claim against Chase, and a

17   "wrongful foreclosure" claim; this case was dismissed. Had the Plaintiff appealed, the District Court's

18   decision may likely have been overturned. Furthermore, if the court accepted the assignments filed in

19   Rapacki's county as valid on face value, and if Rapacki had claimed they were not, as Plaintiff does

20   here, and if they truly were not valid because they contained misrepresentations of material fact and

21   forgeries, then "fraud upon the court" was committed by the attorney(s) who presented the forged

22   documents to the court as genuine and the court's decision is void and can be reopened any time.

1       When fraud is committed upon the court, Rule 4:50-3 allows relief to "be obtained `without

2   limitation as to time.'" *Tara Enters., Inc. v. Daribar Mgmt. Corp., 369 N.J. Super. 45, 52 (App. Div.*

3   *2004) (quoting Shammas v. Shammas, 9 N.J. 321, 327 (1952))*. Equitable principles guide the inquiry

4   and no preordained time limitations are applicable. *Von Pein v. Von Pein, 268 N.J. Super. 7, 15-17 (App.*

5   *Div. 1993)* (holding that one party's material misrepresentation of existing facts for the purpose of

6   evading equitable distribution entitled the other spouse to reopen the fraudulent judgment two years after

7   the divorce was granted). *In The Matter of Estate of Tanksley, NJ: Appellate Div. 2013.*

8       *Transphase Systems v. Southern California Edison* is another antitrust action. It a very complex

9   case involving many issues with little similarity to the Plaintiff's cause of action or claims. The Court

10  granted dismissal primarily because it found that Transphase's antitrust claims against the defendants

11  were barred by the Noerr-Pennington doctrine; that the defendants were immunized from federal

12  antitrust liability by the "state action" doctrine; the defendants were not significant competitors in the

13  relevant product market; and for other reasons that have nothing to do with Rule 12(6)(b).

14      *Associated Gen. Contractors of Cal., Inc. v. Carpenters* is yet another antitrust action that arises

15  out of a dispute between parties to a multiemployer collective-bargaining agreement. The plaintiff

16  unions allege that, in violation of the antitrust laws, the multiemployer association and its members

17  coerced certain third parties, as well as some of the association's members, to enter into business

18  relationships with nonunion firms. This case had nothing to do with a 12(6)(b) dismissal and the

19  Supreme Court's decision in this case centered on completely different issues than those in Plaintiff's

20  case: "*Even though coercion directed by defendants at third parties in order to restrain the trade of*

21  *"certain" contractors and subcontractors may have been unlawful, it does not, of course, necessarily*

22  *follow that still another party — the Union — is a person injured by reason of a violation of the antitrust*

23  *laws within the meaning of § 4 of the Clayton Act.... It is plain, therefore, that the question whether the*

---

1   *Union may recover for the injury it allegedly suffered by reason of the defendants' coercion against*

2   *certain third parties cannot be answered simply by reference to the broad language of § 4. Instead, as*

3   *was required in common-law damages litigation in 1890, the question requires us to evaluate the*

4   *plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.... District*

5   *Court would face problems of identifying damages and apportioning them among directly victimized*

6   *contractors and subcontractors and indirectly affected employees and union entities.... Court was*

7   *correct in concluding that the Union is not a person injured by reason of a violation of the antitrust laws*

8   *within the meaning of § 4 of the Clayton Act. The judgment of the Court of Appeals is reversed.*"

9        *Bell Atlantic Corp. v. Twombly* is an action against petitioners, a group of ILECs (BellSouth

10  Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon

11  Communications, Inc) where plaintiffs seek treble damages and declaratory and injunctive relief for

12  claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1, which

13  prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of

14  trade or commerce among the several States, or with foreign nations."

15       This Supreme Court decision has more similarity to the case before this court than others cited

16  by Counsel for MGC, but the Court's concern centered on the "heightened" pleading standard required

17  when evaluating claims under § 1 of the Sherman Act; not a consideration here. *Bell Atlantic Corp. v.*

18  *Twombly* was also not a pro-se case; so the same standards cannot be applied.

19       To prevent premature dismissal of meritorious cases the Court granted leniency, or "liberal

20  construction," to pro se pleadings against the backdrop of *Conley v. Gibson, 355 U.S. 41 (1957)*. In

21  Conley the court ruled that general allegations of discrimination were sufficient to fulfill the Rule 8

22  requirement of a "short plain statement" because liberal discovery guidelines allowed the complaint to

23  gain much more specificity before trial.

1    Counsel for MGC argues that "for purposes of a motion to dismiss, the court is ordinarily

2    entitled to rely on documents presented as part of a complaint, or upon documents which judicial notice

3    may be taken. *Lee v. City of Los Angeles*; *Branch v. Tunnel.* Facts contained in public records are

4    considered appropriate subjects for judicial notice. *Santa Monica Food Not Bombs v. Santa Monica.*" ...

5    Pursuant to Federal Rule of Evidence Rule 201, '[a] judicially noticed fact must be one not subject to

6    reasonable dispute in that it is... capable of accurate and ready determination by resort to sources whose

7    accuracy cannot reasonably be questioned."

8    The documents from public record submitted to the court for judicial review by Counsel for

9    MGC do not rise to this level of indisputability.

10   **Plaintiff challenges the validity and negotiability of documents filed in county**

11   Plaintiff claims beginning on page 8 lines 13 and continuing through page 11, line 19 of her

12   Amended Complaint that MGC did knowingly and willfully combine, conspire, confederate and agree

13   with the other defendants "to commit certain offenses and acts of fraud to execute and attempt to

14   execute a scheme and artifice to defraud, and to obtain money and property by means of material false

15   and fraudulent pretenses, representations, and promises, by utilizing the United States mail and private

16   and commercial interstate carriers, for the purpose of executing such scheme and artifice, in violation of

17   Title 18, United States Code, Section 1341. The defendants' acts of fraud that include... forging and

18   falsifying signatures on mortgage-related documents and/or conspired with others to do so as their

19   agents in order to prepare and file with property recorders' offices throughout the United States; and

20   specifically with Washington County Oregon's recorder's office where defendant's filed various

21   mortgage related documents specific to Plaintiff's property.... Defendant's or their agents and/or cohorts

22   hired temporary workers to sign as Authorized Signers and thereby misrepresent their signatures as

23   those of the Authorized Signers. These mortgage-related documents were fraudulently notarized by

1    defendants' employees and/or employees of their agents who knew the Authorized Signer did not

2    actually sign the documents…. After these false documents were signed and notarized, defendants filed

3    them through the mails or by electronic methods with local county property records offices, including

4    the Plaintiff's county…. Defendants knew that these property recorders, as well as those who received

5    the documents such as courts, title insurers, and homeowners/borrowers, relied on these documents as

6    genuine."

7           Therefore, Plaintiff's claims in her Amended Complaint are clear in that she challenges the

8    validity of the assignments of Deed of Trust available from the public land title records; and presented to

9    the court by Counsel for MGC as their Exhibits A, B, C and D.

10          Plaintiff addresses each of these Exhibits herewith:

11   **<u>Deed of Trust (MGC's Exhibit A)</u>**

12          The document presented to the court by counsel for MGC, referred to as the Deed of Trust,

13   ("DOT") is not a true and accurate copy of the document recorded in Plaintiff's county. Pages are

14   missing. Pages are cut off and missing content and a line exists across the center of the pages that is not

15   present in the copy recorded with county. The first page of the DOT filed with the county is missing

16   from MGC's Exhibit A. (See Plaintiff's Exhibit B, first page of DOT.)

17          Quoting from Plaintiff's Amended Complaint page 13, lines 3 – 22; "*Beginning in January 2004*

18   *People's Choice Home Loan, Inc. (hereafter referred to as "People's") continually postponed the*

19   *closing of Plaintiff's mortgage refinance to a date they knew would place her in duress, on or about*

20   *February 9, 2004. People's deceptively inserted additional pages into the closing documents with terms*

21   *that were different from that those agreed to by Plaintiff. Additionally, signature pages were included in*

22   *the closing documents that contained only Plaintiff's signature and name. These pages were not dated;*

23   *they did not contain witness signatures although lines were included for them; and these pages*

1  *contained no content that would identify them as belonging to a specific contract or as validation for a*

2  *specific contract. People's and/or the other defendants and or their agents later used these blank*

3  *signature pages to fabricate Plaintiff's signature so as to make it appear she had agreed to contract*

4  *terms that she in fact did not.*

5      *Plaintiff had agreed to a 6.99% fixed rate loan with no early pre-payment penalty. Terms*

6  *fraudulently changed by People's included, but were not limited to, a change in the interest terms and a*

7  *pre-payment penalty. The initial pages of the documents Plaintiff signed at closing stated the agreed to*

8  *fixed rate; however pages inserted into the middle of the stack of documents she was asked to sign at*

9  *closing stated an ARM rate and included a substantial pre-payment penalty. These changed terms*

10  *caused Plaintiff a significant increase in the overall cost of the loan. Therefore the loan costs were*

11  *misrepresented and not disclosed as required by TILA. These changed terms also trapped Plaintiff into a*

12  *predatory situation created deliberately by the defendants so as to allow them to perpetrate their scheme*

13  *and artifice to defraud the Plaintiff. "*

14      The Adjustable Rate Rider included in MGC's Exhibit A is materially different from Plaintiff's

15  copy retained from closing. The document attached as part of MGC's Exhibit A is also formatted

16  differently and contains different language. The title page includes Plaintiff's address, whereas the one

17  Plaintiff signed at closing did not. The first section of this document is labeled "A. INTEREST RATE

18  AND MONTHLY PAYMENT CHANGES" with the subsections to this section labeled "4.(A); 4.(B);

19  4.(C) etc.

20      Note that the first subsection actually begins with numeral "4" rather than "1" as would be

21  expected. This indicates something is missing from the document that Counsel for MGC presented to the

22  court for judicial review; and in fact something is missing.

1    In the Adjustable Rate Rider initialed by Plaintiff at closing the first section is labeled "1.

2    BORROWER'S PROMISE TO PAY" and continues with the following sections: "2. INTEREST; 3.

3    PAYMENTS; 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES". (See Plaintiff's

4    Exhibit C, Adjustable Rate Rider.)

5        The page number designation on the copy of Plaintiff's Adjustable Rate Rider is "Page 1 of 4";

6    whereas the page number designation on the document Counsel for MGC presented to the court for

7    review is "Page 1 of 3". The document presented to the court by Counsel for MGC and filed in her

8    county is not the same document Plaintiff signed. The Plaintiff's loan application shows a fixed rate of

9    6.99% yet a Truth in Lending Disclosure from closing shows yet another set of terms. (See Plaintiff's

10   Exhibit D, Loan Application and Exhibit E, Truth in Lending Disclosure with different terms than

11   Exhibits C & D.) A contract with terms as unclear as this cannot be negotiable.

12       As Plaintiff claimed in her Amended Complaint the terms of her mortgage were deceptively

13   changed with intent to defraud her. These changes were to her detriment. Plaintiff can produce evidence

14   and witnesses with knowledge of facts material to Plaintiff's claims willing and qualified to testify if

15   called to do so.

16       **THEREFORE, THE VALIDITY AND NEGOTIABILITY OF THE DOCUMENT**

17   **PRESENTED TO THE COURT FOR JUDICIAL NOTICE AS MGC'S EXHIBIT A IS**

18   **DISPUTED.**

19   **Assignment of Deed of Trust recorded in 2006 (MGC's Exhibit B)**

20       The document presented to the court by Counsel for MGC as their Exhibit B and identified as

21   document number 2006-077542 filed with Washington County Oregon on June 28, 2006, is not a true

22   and accurate copy of the document recorded in Plaintiff's county. Their copy contains two extra pages

23   not included in the county records, page 2 and page 4 of their Exhibit. Both contain illegible content.

1    Page 4 appears to have a mirrored reflection of a seal on it. These two pages are not included in the

2    county records.

3            More importantly Counsel for MGC omitted a Substitution of Trustee document also filed with

4    Washington County Oregon on June 28, 2006, and recorded as document number 2006-077543. (See

5    Plaintiff's Exhibit F.)

6            Oregon law requires three parties for transactions involving Deed of Trusts. This document

7    purports to substitute the original Trustee, Paul S. Cosgrove, and the original "Beneficiary," People's

8    Choice Home Loan, Inc., to give the appearance of authenticity for a fraudulent assignment of deed of

9    trust to Homecomings Financial Network Inc. filed the same day, i.e. the assignment Counsel for MGC

10   presented to the court as their Exhibit B. This was done to expedite a fraudulent foreclosure and trustee's

11   sale that same month. Both the assignment and the Substitution of Trustee document contain material

12   misrepresentations of fact and/or forgeries.

13           The Substitution of Trustee document is signed by Debra Lyman as Vice President of

14   Homecomings Financial Network, Inc. and dated March 18, 2006. The document is notarized by Laura

15   Herrera, a Harris County Texas notary. Laura Herrera's signature is dated March 20, 2006. Above Laura

16   Herrera's signature this document states: "...personally appeared Debra Lyman before, Vice President,

17   personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s)

18   whose name(s) is/are subscribed to the within instrument."

19           The address on the Assignment filed the same day for Homecomings Financial Network, Inc. is

20   stated as: "One Meridian Crossing, Suite 100, Minneapolis, MN 56423." (See highlighted areas of

21   Plaintiff's Exhibit F)

22           If Debra Lyman was Vice President of Homecomings Financial Network, Inc. she would have

23   signed this document in Minnesota. Yet it is notarized in Texas two days later.

1    Debra Lyman is a known robo-signer for Defendant Ocwen fak/aka Litton Loan Servicing. (See
2    page 4 of Plaintiff's Exhibit F.)

3    Plaintiff attempted to obtain a copy of Laura Herrera's log book, but was told by the Texas
4    Secretary of State's Office that she never turned in her log book. Plaintiff was told she could obtain a
5    copy of her log book page for March 20, 2006 by requesting it from Laura Herrera directly at the
6    address on her application. Plaintiff sent a written request via U.S. Postal Service with a return signature
7    request. This letter was returned to Plaintiff as undeliverable.

8    A comparison of Notary Laura Herrera's signature on other mortgage related documents filed in
9    other counties in other States show a high probability that multiple individuals were using Laura
10   Herrera's Notary Commission stamp and forging her signature. (See page 5 of Plaintiff's Exhibit F.)

11   The Substitution of Trustee document also has stamped in its left margin "Fidelity National Title
12   Company." (See highlighted areas of pages 2 & 5 of Plaintiff's Exhibit F.)

13   Fidelity National Title Co. is a subsidiary of Fidelity National Financial, Inc. named as a
14   company controlled by Lorraine Brown in the criminal indictment brought against her by the United
15   States for Conspiracy to Commit Mail and Wire Fraud. (*United States District Court Middle District of*
16   *Florida Jacksonville District; United States of America v. Lorraine Brown; case # 3:12-CR-198-J-*
17   *25MLR.*) Below is an excerpt from the Lorraine Brown guilty plea for this crime which is also attached
18   as Plaintiff's Exhibit G.

19   "*In mid-2005, Jacksonville, Florida based* **Fidelity National Financial, Inc.** *("FNF") purchased*
20   *DocX from Brown and her partners. Through corporate reorganizations within FNF, DocX later fell*
21   *under ownership of Fidelity National Information Services, Inc. ("FNIS"). In mid-2008, FNIS spun off a*
22   *number of business lines into a new publicly-traded entity, Lender Processing Services, Inc. ("LPS"),*
23   *based in Jacksonville, Florida. At that time, DocX was rebranded as "LPS Document Solutions, a*

1   *Division of LPS." Following this spin-off, Brown was the President and Senior Managing Director of*

2   *LPS Document Solutions, which constituted DocX's operations in Alpharetta. At all times relevant to*

3   *this Information, Brown was the chief executive of the DocX operations."*

4   Also excerpted from Lorraine Brown criminal plea of guilt:

5   *"The manner and means by which Brown, **her co-conspirators, and others** sought to accomplish the*

6   *purposes and objectives of the conspiracy included forging and falsifying signatures on the mortgage-*

7   *related documents that they prepared and filed with property recorders' offices throughout the United*

8   *States.*

9   *These documents, particularly mortgage assignments and lost note or assignment affidavits, were later*

10  *relied upon in court proceedings, including property foreclosures and in federal bankruptcy court.*

11  *Brown knew that these property recorders, as well as **those who received the documents such as***

12  ***courts, title insurers, and homeowners, relied on these documents as genuine.***"

13  The forged and falsified signatures on the Substitution of Trustee Document and on the Deed

14  Assignment presented to the court by Counsel for MGC as their Exhibit A are consistent with the

15  manner and means identified by the United States in their criminal conviction of Brown. These false

16  records were indeed mailed and/or transferred electronically to Plaintiff's county. According to the clerk

17  at her county recorders this is how they are sent.

18  Furthermore, the Deed Assignment presented to the court by Counsel for MGC as their Exhibit

19  A states: "This Instrument Prepared By: First American Title Insurance Company, address 200 SW

20  Market, #150, Portland OR 97201, tel, no.: (503)790-7890…"

21  The phone number, 503-790-7890, is disconnected; but Plaintiff was able to contact Mitch

22  Steeves, Oregon State Manager, at First American Title on November 2, 2011 and emailed this

1    Assignment of Deed of Trust to him for review. He told me it is highly unlikely his company prepared

2    this document. His email response is on page 8 of Plaintiff's Exhibit F.

3            The Deed Assignment presented to the court by Counsel for MGC as their Exhibit A is signed by

4    Dana Lantry as Asst. Vice President of People's Choice Home Loan, Inc. Evidence shows this is a

5    misrepresentation of her position and possibly her employer as her name is on a loss mitigation form for

6    UBS AG New York Branch with the same address as the one for People's Choice Home Loan, Inc.

7    stated on the Deed Assignment in question.

8            **THEREFORE, THE VALIDITY AND NEGOTIABILITY OF THE DOCUMENT**

9    **PRESENTED TO THE COURT FOR JUDICIAL REVIEW AS MGC'S EXHIBIT B IS**

10   **DISPUTED.**

11   **Assignment of Deed of Trust recorded in 2008 (MGC's Exhibit C)**

12           The document presented to the court by Counsel for MGC as their Exhibit C and identified as

13   document number 2008-073971 filed with Washington County Oregon on August 27, 2008, is not a true

14   and accurate copy of the document recorded in Plaintiff's county. Their copy contains two extra pages

15   not included in the county records, page 2 and page 4 of their Exhibit. Both contain illegible content.

16   Page 4 contains a legible bar code with Plaintiff's name and the numbers 10335983 and PIA05 which

17   Plaintiff has never seen before. These two pages are not included in the county records.

18           This assignment instrument alleges to assign the DOT from Homecomings Financial Network,

19   Inc. to Residential Funding Company, LLC. The document is signed by Masse Adjetey as Vice

20   President of Homecomings Financial Network, Inc. No date is provided for his signature; however

21   above the Notary's signature this document states: "On 04/03/2006 before me the undersigned, a Notary

22   Public in and for said State personally appeared Masse Adjetey, Vice President of Homecomings

23   Financial Network, Inc., personally known to me to be the person whose name is subscribed to the

1    within instrument and acknowledged to me that s/he executed the same in his/her capacity, and that by

2    his/her signature on the instrument the entity upon behalf of which the person acted, executed the

3    instrument. Witness my hand and official seal." Minnesota Notary, Mary K. Olson signed this

4    instrument.

5          It would have been impossible for Masse Adjetey to have signed this instrument on April 3, 2006

6    as alleged because at that time he was a student at the Université de Lomé in Togo Africa. It was also

7    impossible for Masse Adjetey to have been a "Vice President" of Homecomings Financial Network, Inc.

8    at this time, so it was impossible for Mary K. Olson to honestly validate his signature as such in 2006.

9          Masse Adjetey's LinkedIn profile in 2011 shows him as a Quality Technician for RytWay from

10   August 2008 to October 2009, while at the same time he alleges to be a Mortgage Loan Specialist for

11   Wells Fargo Home Mortgage. Masse doesn't post any position as the Vice President for Homecomings

12   Financial Network, Inc. in his LinkedIn profile. He does post a position with RytWay.

13         Peggy Anderson in RytWay's HR Department confirmed Masse Adjety-Adjevi was an employee

14   from August 2008 until May 2009. He worked full time in a medium skill level position, Quality Tech

15   Level 1, and tested the quality of food products. It is highly unlikely that a Vice President of a large

16   financial institution would also work full time as a medium skilled employee in a food processing plant.

17         THEREFORE, if Masse Adjetey was the actual signer of the deed assignment in question then he

18   misrepresented himself as the "Vice President" of financial Homecomings, and he most likely did not

19   sign it in 2006; and Notary Mary K. Olson, if she if fact was the signer of this instrument notarizing his

20   signature, committed perjury. If Masse Adjetey did not personally sign this instrument and an unknown

21   party signed his name in behalf of Homecomings, or RFC or LNV then his signature on this instrument

22   is a forgery. If Notary Mary K. Olson did not personally sign this instrument then her signature is also a

23   forgery, and the party who forged her signature abused her Notary Commission.

1      THEREFORE, the alleged deed assignment in question contains forgeries and/or omissions and

2      misrepresentations of material fact.

3      Furthermore this is consistent with the manner and means indentified by the United States as

4      those used by Brown and her co-conspirators in the perpetration of their crimes. Following is another

5      excerpt from the Lorraine Brown criminal guilty plea:

6      *"Beginning in or about 2005, employees of DocX, at the direction of Brown and others, began*

7      *forging and falsifying signatures on the mortgage-related documents that they had been hired to prepare*

8      *and file with property recorders' offices throughout the United States....**Brown also hired temporary***

9      ***workers to sign as Authorized Signers.** These temporary employees worked for much lower costs and*

10     *without the quality control represented by Brown to DocX's clients. In fact, some of these temporary*

11     *workers were able to sign thousands of documents a day. These mortgage-related documents were*

12     *fraudulently notarized by DocX employees even though the Authorized Signer did not actually sign the*

13     *document.Brown also hired temporary workers to sign as Authorized Signers. These temporary*

14     *employees worked for much lower costs and without the quality control represented by Brown to DocX's*

15     *clients. In fact, some of these temporary workers were able to sign thousands of documents a day. These*

16     *mortgage-related documents were fraudulently notarized by DocX employees even though the*

17     *Authorized Signer did not actually sign the document.*"

18     Plaintiff is a victim of the crimes committed by Lorraine Brown and her co-conspirators.

19     Plaintiff claims that Defendants named in her Amended Complaint, including MGC, are or were either

20     co-conspirators with Lorraine Brown or co-conspirators with her co-conspirators. The United States

21     identified unnamed "co-conspirators, and others" in their criminal indictment and conviction of Brown.

22     A criminal conviction is conclusive proof and operates as an estoppel on defendants as to the

23     facts supporting the conviction in a subsequent civil action. *Local 167 of International Brotherhood of*

*Teamsters, Chauffeurs, Stablemen & Helpers of America v. United States, 291 U.S. 293, 298-99, 78 L.*

*Ed. 804, 54 S. Ct. 396 (1934); Brown v. United States, 207 Ct. Cl. 768, 524 F.2d 693, 705 (1975).*

"Yet they need not all be indicted or named. Indeed, an indictment charging that the named

defendant and 'other persons unknown . . . did . . . conspire' was approved in *State v. Hightower, 221*

*S.C. 91, 94, 69, S.E.2d 363, 366 (1952)[.]" McAninch & Fairey 481. In Hightower, there was "ample*

*evidence that the conspirators, though unknown, did exist." McAninch & Fairey 481.*

Criminal liability is sometimes referenced as the Pinkerton doctrine, which is based on the

seminal United States Supreme Court case of *United States v. Pinkerton, 328 U.S. 640 (1946).* Federal

judges frequently describe the doctrine in jury instructions as "the hand of one is the hand of all to the

conspiracy." Below is an excerpt of a Pinkerton jury instruction that was approved by the Fourth Circuit

Court of Appeals in *United States v. Aramony, 88 F.3d 1369 (4th Cir. 1996):*

*"Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy*

*existed and that a defendant was one of the members, then the statements thereafter knowingly made*

*and the acts thereafter knowingly done by any person likewise found to be a member may be*

*considered by the jury as evidence in the case as to the defendant found to have been a member,*

*even though the statements and the acts may have occurred in the absence of and without the*

*knowledge of the defendant, provided such statements and acts were knowingly made and done*

*during the continuance of such conspiracy and in furtherance of some object or purpose of the*

*conspiracy.*

*Furthermore, all members of the conspiracy are equally guilty of all crimes committed pursuant to*

*and in furtherance of the conspiracy. For example, if, in the process of committing the bank fraud*

*pursuant to the conspiracy one of the co-conspirators illegally laundered the money proceeds, all of*

1     *the conspirators would be criminally liable for the unlawful money laundering as well as the bank*

2     *fraud and criminal conspiracy. " United States v. Zabic, 745 F.2d 464, 474-75 (7th Cir. 1984).*

3     MGC is equally guilty for all crimes committed by the conspiracy, and is legally accountable for

4     compensation of losses and other damages caused to Plaintiff by the fraudulent deed assignments and

5     other false mortgage documents filed in her county beginning in 2006 and into the present.

6     **THEREFORE, THE VALIDITY AND NEGOTIABILITY OF THE DOCUMENT**

7     **PRESENTED TO THE COURT FOR JUDICIAL REVIEW AS MGC'S EXHIBIT C IS**

8     **DISPUTED.**

9     **Assignment of Deed of Trust recorded in 2008 (MGC's Exhibit D)**

10    The document presented to the court by Counsel for MGC as their Exhibit D and identified as

11    document number 2008-073972 filed with Washington County Oregon on August 27, 2008, is not a true

12    and accurate copy of the document recorded in Plaintiff's county. Their copy contains two extra pages

13    not included in the county records; page 2 and page 3 of their Exhibit appear to be duplicates. Page 4

14    contains contain illegible content and a mirror image of the LNV stamp. These extra pages are not

15    included in the county records.

16    This assignment document alleges to assign the DOT from Residential Funding Company, LLC

17    to LNV Corporation.

18    This document is signed by Betty Wright as Assistant Vice President of Residential Funding

19    Corporation. This document is notarized by Minnesota Notary, Diane M. Meistad. Although evidence

20    exists to show that these documents contain misrepresentations of material fact and possible forgeries,

21    this assignment would by necessity be void and non-negotiable if the prior assignments contained

1    forgeries and misrepresentations of material fact made with intent to defraud; and if a non-curable break

2    in the chain of title already existed as claimed by Plaintiff in her Amended Complaint.

3         However, in the event this instrument might be deemed negotiable by the court, then other issues

4    of misrepresentation worthy of discovery exist.

5         Page one of MGC's Exhibit D states in section "4. TRUE and ACTUAL CONSIDERATION (if

6    any), ORS 93.030) Ten and No/100 Dollars ($10.00)"

7         ORS § 93.030(2) requires that, "All instruments conveying or contracting to convey fee title to

8    any real estate, and all memoranda of such instruments, shall state on the face of the instruments the true

9    and actual consideration paid for the transfer, stated in terms of dollars. However, if the actual

10   consideration consists of or includes other property or other value given or promised, neither the

11   monetary value nor a description of the other property or value need be stated **so long as it is noted on**

12   **the face of the instrument that other property or value was either part or the whole**

13   **consideration**."

14        ORS § 93.030(4) requires that, "If the statement of consideration is in the body of the instrument

15   **preceding the signatures, execution of the instrument shall constitute a certification of the truth of**

16   **the statement.** If there is a separate statement of consideration on the face of the instrument, it shall be

17   signed separately from the instrument, and such execution shall constitute a certification of the truth of

18   the statement by the person signing."

19        The true and actual consideration paid for the transfer was stated in terms of dollars ($10.00) and

20   no additional consideration consisting of other property or other value given or promised was noted on

21   the instrument; which was signed.

22        MGC and LNV have been attempting to extort more than $300,000 from Plaintiff since 2010 for

23   a property they allegedly acquired for a mere $10.00 as per this alleged instrument.

1          It doesn't take a rocket scientist to conclude that "something is fishy in Denmark" here. LNV

2   was incorporated in the State of Nevada on March 17, 2008. The website of the Nevada Secretary of

3   State ("Nevada SOS") shows LNV as a "Domestic Corporation" with "Entity Number" E016970208-8.

4   (See Plaintiff's Exhibit H.)

5          Notice the highlighted area that shows the declared "Capital Amount" which the Nevada SOS

6   defines as: "The total monetary value of all shares associated with the entity which is calculated as Par

7   Share Count x Par Share Value." is only $100; and the "Par Share Value" which the Nevada SOS

8   defines as: "The monetary value per share..." is only $0.01. This is highly suspicious for a company that

9   purports to "purchase" distressed debt in the billions of dollars and alleges to be a "beneficiary" on deed

10  of trust documents pertaining to hundreds of thousands of residential properties with average market

11  values in excess of $200,000 each; and for which it initiates and completes foreclosure actions in its own

12  behalf to take possession of such properties.

13         Beal has a provable history of creating sham companies for purposes of tax fraud. Plaintiff is not

14  just making wild accusations as purported by Counsel for MGC, she quotes from those in positions of

15  authority who have come to such conclusions after review of much evidence; the IRS and Federal

16  District and Appellate Court Justices of the Fifth Circuit. The Appellate Court affirmed the District

17  Court decision in favor of the IRS and against Defendant D. Andrew Beal in *Southgate Master Fund,*

18  *L.L.C. v. United States, 659 F.3d 466, 484 (5th Cir. 2011).*

19         To quote the Appellate Court Justices, *"We affirm in all respects the district court's judgment*

20  *disposing of this petition for a readjustment of partnership tax items under 26 U.S.C. § 6226. The*

21  *plaintiff, Southgate Master Fund, L.L.C., was formed for the purpose of facilitating the acquisition of a*

22  *portfolio of Chinese nonperforming loans ("NPLs"). A partnership for tax purposes, Southgate's*

23  *disposition of its portfolio of NPLs generated more than $1 billion in paper losses, about $200 million of*

1    *which were claimed as a deduction by one of its partners* [D. Andrew Beal] *in tax year 2002.* **The**

2    **Internal Revenue Service determined that Southgate was a sham partnership** *that need not be*

3    *respected for tax purposes and that Southgate's allocation of the $200 million loss to the deducting*

4    *partner should be disallowed. The district court upheld these determinations. After laying out the*

5    *pertinent factual background in Part I, we explain in Part II why the district court was correct to do so.*"

6          **THEREFORE, THE VALIDITY AND NEGOTIABILITY OF THE DOCUMENT**

7    **PRESENTED TO THE COURT FOR JUDICIAL REVIEW AS MGC'S EXHIBIT D IS**

8    **DISPUTED.**

9          Counsel for MGC argues "As set forth in McDamiel v. BAC Loans Servicing, L.P. 2011… the

10   Oregon District Court Upheld that it is appropriate for the court to take judicial notice of public land title

11   records relating to real property and foreclosure matters. Moreover, when judicial notice is taken. '[t]he

12   court need not accept as true allegations in the complaint that contradict these sources' … (holding that

13   documents recorded in the land title records 'shall be prima facie evidence in any court of the truth of

14   the matters set forth therin.')" The cases cited by Counsel for MGC were all decided prior to the

15   conviction of Lorraine Brown in favor of the United States for criminal conspiracy to defraud. Excerpted

16   from the criminal indictment (Plaintiff's Exhibit G):

17          *"…these false documents were … filed them through the mails or by electronic methods with*

18          *local county property records offices. Many of these documents, particularly mortgage*

19          *assignments and lost note or assignment affidavits, were later relied upon in court proceedings,*

20          *including property foreclosures … Brown knew that these property recorders, as well as those*

21          *who received the documents such as courts, title insurers, and homeowners, relied on these*

22          *documents as genuine."*

1    When courts rely on false documents as genuine, then the decisions these courts make based of

2    such false facts are not valid and Rule 4:50-3 allows relief to "be obtained `without limitation as to

3    time.'" The United States recognizes that millions of these false documents have been filed with county

4    recorders throughout the country. It behooves this Court to seriously consider the validity and

5    negotiability claims made by this Plaintiff as to the county records for which Counsel for MGC requests

6    judicial review.

7    Counsel for MGC cites *Barrett v. Belleque* to support his opinion that Plaintiff's Amended

8    Complaint is similar to Barrett's and that she can "prove no set of facts in support that entitle him [or

9    her] to relief." Barrett was a pro-se litigant but he was also a prisoner at the Oregon State Penitentiary

10   and his case centered on violation of various prison disciplinary rules. A completely different standard

11   would apply here as this Plaintiff has never been incarcerated nor committed a crime; and no reason

12   exists to doubt her credibility.

13   In the Ninth Circuit Motions to Dismiss under Rule 12(b)(6) are disfavored and rarely granted.

14   *Gilligan v. Jameco Development, 108 F.3d. 246, 249 (9th Cir.1997).* The standard for dismissal is

15   stringent. Dismissal is denied unless it appears beyond a doubt that plaintiff can prove no set of facts

16   which would entitle her to relief. *Conley v. Gibson, 355 U.S. 41, 47 (1957); Cervantes v. City of San*

17   *Diego 5 F.3rd 1273, 1274 (9th.Cir.1993); Balistreri v. Pacific Police Dept., 901 F.2d 696, 699 (9th*

18   *Cir.1990).*

19   The Court must accept all allegations as true, draw all reasonable inferences in Subramaniam's

20   favor and resolve all doubts in her favor. It must construe allegations in a light most favorable to

21   Subramaniam. *Wyler Summit Partnership v. Turner Brdtg Inc., 135 F. 3d 658, 661 (9th Cir.1998).*

22   Plaintiff need only plead facts to state a claim for relief that is plausible on its face. *Bell Atlantic*

23   *Corporation v. Twombly, 550 U.S. 544, 570 (2007).* A claim has facial plausibility when plaintiff pleads

1    enough factual content to allow the court to draw a reasonable inference that a defendant is liable for the

2    misconduct alleged." *Ashcroft v. Iqbal,129 S. Ct. 1937, 1949 (2009)*.

3         A complaint must "only give the defendant fair notice of what plaintiffs claim is and the grounds

4    of which it rests." *Conley v. Gibson, 355 U.S. 41, 47 (1957)*; Generally, a court may not consider

5    material beyond the pleadings. *Hal Roach Studios v. Richard Feiner & Co., 896 F. 2d 1542, 1555 n.19*

6    *(9th Cir.1990)*. A district court should give leave to amend unless a complaint cannot be saved by

7    amendment. *Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996)*. If the court believes Subramaniam has

8    not pleaded sufficient facts she will amend to cure any deficiencies the court may find.

9         Plaintiff is not required to prove her case, but only to allege enough facts to place each defendant

10   on notice of the causes of action, general facts, the elements and damages. In accordance with the

11   holding in *Bell Atlantic*, proof of the specific and detailed wrong doing is reserved for a later stage of the

12   litigation due to the simple fact that such proof can only be obtained through discovery. Plaintiff alleged

13   that defendants undertook the misdeeds herein. Defendants named herein are indeed liable to the extent

14   that they acted as agents, servants and/or employees of the remaining defendants and for each other.

15        THEREFORE, MGC's motion to dismiss pursuant Rule 12 should be denied.


16   ## The Standard of Review on a Rule 9 Motion

17        Counsel for MGC claims Plaintiff's pleadings fail to meet the "heightened pleading standards"

18   of Rule 9; however she has pled with the same basic language and claims used by the United States in

19   their criminal indictment of Lorraine Brown pertaining to the mail and wire fraud conspiracy of which

20   she is a victim. Plaintiff does not make a "conclusory allegation" but is stating facts already proved to be

21   true by the United States in *United States of America v. Lorraine Brown.*

1    In addition to evidence of fraud and conspiracy to commit fraud specific to the county land

2    records, Plaintiff have evidence and witnesses willing to testify to facts pertaining to the unlawful and

3    fraudulent business practices of MGC, LNV, Property Acceptance Corporation, Beal Bank, and the

4    individual person who the ultimate owner of all these business entities, D. Andrew Beal.

5        As per *Southgate Master Fund, L.L.C. v. United States* D. Andrew Beal creates various business

6    entities to exist primarily on paper only to accomplish specific objectives; excerpts from *Southgate*:

7    *"Beal is the founder and sole owner of the Beal Financial Corporation and its subsidiary, Beal Bank (collectively,*
8    *"the Bank"). Beal and the Bank's core business involves identifying and purchasing assets that are undervalued*
9    *because the market has mispriced their level of risk. Included within this category are NPLs, which are loans as*
10   *to which the borrowers are in default, are in arrears, or have otherwise failed to perform under the terms of the*
11   *loan agreement. For years the Bank focused primarily on domestic investment opportunities. But as the domestic*
12   *market began to price risk more efficiently, Beal and the Bank began to focus on identifying inefficiencies and*
13   *investment opportunities in foreign markets.... Montgomery—acting in his capacity as an employee of the Bank—*
14   *researched the emerging market in Chinese NPLs.... Montgomery sought De Castro's advice on how to structure*
15   *an acquisition of Chinese NPLs so that it would create tax benefits for Beal.... he had identified the portfolio of*
16   *NPLs he was going to recommend that Beal acquire, he form a partnership with Cinda and have Cinda contribute*
17   *the NPLs to the partnership. By purchasing a portion of Cinda's interest in the partnership to which it had*
18   *contributed the NPLs instead of purchasing the NPLs directly from Cinda, Beal would be able to generate a*
19   *paper loss that he could claim as a deduction on his individual tax return.... If Beal were to purchase the NPLs*
20   *directly from Cinda, that built-in loss would evaporate, and Beal would take a cost basis in the NPLs equal to*
21   *their purchase price. If Cinda instead contributed to the NPLs to a partnership and Beal then purchased Cinda's*
22   *interest in the partnership, the built-in loss would be preserved and transferred to Beal. Any loss realized on the*
23   *partnership's sale of the NPLs would be allocated to Beal for tax purposes.... On July 18, 2002, Montgomery,*
24   *Beal, and attorneys from De Castro participated in a conference call in which Montgomery presented the results*
25   *of his due diligence and recommended that Beal invest in a portfolio of unsecured Chinese NPLs. The parties also*
26   *discussed the potential tax benefits to Beal that would result from the partnership-based transaction structure*
27   *proposed by De Castro. Beal explained on the call that the Bank was not in a position to invest in the NPLs.*
28   *Montgomery—who up until this time had been acting in his capacity as an employee of the Bank—asked Beal to*
29   *release him from his obligation to the Bank so that he could continue to pursue the deal in an individual capacity.*
30   *Beal agreed. He also told Montgomery that he might be interested in pursuing the investment personally, outside*
31   *of the Bank, and asked Montgomery to come back to him once Montgomery had finalized a deal. That same day,*
32   *Montgomery formed Montgomery Capital Advisers, LLC ("MCA"), a single-member limited liability company*
33   *through which Montgomery could continue to pursue an investment in Chinese NPLs.... On July 31 and August 1,*
34   *2002, Montgomery and Cinda consummated a series of five transactions. First, Cinda formed Eastgate, a single-*
35   *member limited liability company organized under Delaware law. As a wholly owned subsidiary of Cinda,*
36   *Eastgate was created for the purpose of acting as Cinda's United States investment vehicle for NPL transactions.*
37   *Second, Cinda contributed to Eastgate the portfolio of NPLs selected by Montgomery. Cinda contributed the*
38   *NPLs to Eastgate pursuant to a contribution agreement in which it made a series of warranties and*
39   *representations stating that Cinda had not written off, compromised, or made a determination of worthlessness as*
40   *to any of the NPLs. Third, MCA (Montgomery's single-member LLC) and Eastgate formed and organized*
41   *Southgate as a limited liability company under Delaware law.... Upon formation, Eastgate contributed the NPLs*
42   *to Southgate pursuant to a virtually identical contribution agreement. In exchange, Eastgate received a 99*
43   *percent ownership interest in Southgate and an initial capital account balance of $19,420,000 (an amount*

*roughly equal to 1.7 percent of the NPLs' face value, which reflected the parties' negotiated determination of the loans' fair market value). Montgomery contributed cash and a promissory note worth $196,162 in exchange for a 1 percent ownership interest in Southgate. Montgomery was appointed as Southgate's sole manager.... Fourth, Montgomery entered into a brokerage agreement with Deutsche Bank. Montgomery agreed to pay Deutsche Bank $50,000 for its services as the exclusive placement agent for Cinda's NPLs. In addition, Montgomery agreed that he would pay an additional fee to Deutsche Bank if and when an investor purchased Cinda's interest in Southgate. The fee, which was tied to the percentage of the face value of the loans in Southgate's portfolio, came to about $8.5 million.... Finally, Southgate and Cinda signed a loan-servicing agreement ("LSA") in which Southgate agreed to pay Cinda 25 percent of net collections in exchange for servicing the NPLs.... any fees it earned as a loan servicer it was free to retain for its own operations. Montgomery thus was able to negotiate the acquisition price of the NPLs from 3-to-3.5 percent down to 1.7 percent by agreeing to have Southgate enter into an LSA that paid Cinda a more generous fee than it otherwise would have been willing to pay.... These transactions positioned Southgate as a tax-friendly investment vehicle. Southgate was holding NPLs with a built-in loss of more than $1.3 billion, all of which was allocable to Cinda. An investor who purchased Cinda's interest in Southgate would step into Cinda's shoes and be positioned to claim the tax losses that Southgate generated as it disposed of the loans in its portfolio for pennies on the dollar. Southgate thus stood to generate more than $1 billion dollars in paper losses....  recommending that Beal purchase a portion of Cinda/Eastgate's interest in the Southgate partnership. Beal readily agreed to do so. He formed a single-member Delaware LLC, Martel Associates, through which he would invest in Southgate.... On August 30, 2002, Beal paid Cinda $19,407,000 in exchange for 90 percent of Eastgate's interest in Southgate. Beal thus wound up with an 89.1 percent ownership interest, leaving Cinda with a 9.9 percent interest and Montgomery's 1.0 percent share unchanged. Beal also assumed Montgomery's obligations under the brokerage agreement with Deutsche Bank and paid the $8.5 million placement fee.... With the detail papered, the parties turned to developing a collection strategy that would be responsive to both profit- and tax-driven concerns.... The goal was to focus collection efforts on nuggets that would eventually be identified within this smaller pool. The balance of the portfolio would be packaged into smaller groups and sold off to small Chinese collection firms; the proceeds of the sales would provide Southgate with working capital.... this collection strategy would create losses in amounts tailored to the amounts of personal income against which Beal sought to claim deductions.... One final step remained in the tax plan: Beal needed to build his outside basis in Southgate. A partner's "outside basis" is his adjusted basis in his ownership interest in the partnership. When a partner purchases a partnership interest, he generally takes a cost basis in his partnership interest. In other words, his outside basis is equal to the amount he paid to acquire the partnership interest. And while partnership losses are deductible by the individual partners, the amount of allocated partnership loss that a partner can claim as a deduction on his individual tax return is capped at the amount of his... outside basis. If the amount of a partnership loss that is allocable to the partner exceeds his outside basis, the overage remains suspended inside the partnership and can only be claimed if the partner builds his outside basis during a future tax year. Thus, the fact that some $263.5 million of Southgate's built-in losses were allocable to Beal was not enough to make the full value of those losses deductible by Beal on his 2002 tax return. Up until the very end of 2002, Beal's outside basis in Southgate was only about $29.9 million (the roughly $19.4 million he paid for his partnership interest plus about $10.5 million in transaction and operating costs). To be able to deduct most of the built-in loss that was allocable to him, Beal needed to build his outside basis in Southgate.... In late 2002, Beal owned some GNMAs with a fair market value of approximately $180.6 million. GNMAs are fixed-rate, mortgage-backed securities. The GNMAs that Beal owned were platinum securities backed by the full faith and credit of the United States, which guaranteed timely payment of principal and interest. In late December 2002, Beal nominally contributed the GNMAs to Southgate in an effort to build his outside basis in the partnership.... the GNMA basis-build took place in three steps. First, Beal contributed the GNMAs to Martel (the single-member LLC through which he had purchased his interest in Southgate). Second, Martel distributed its interest in Southgate to Beal. Beal thereby became an 89.1 percent owner of Southgate. Instead of owning an interest in Southgate through Martel, Beal now owned his interest in Southgate directly. Third, Beal contributed Martel to Southgate. Both Southgate's and Martel's operating agreements were amended to irrevocably appoint Beal as the sole manager of Martel and to reflect Beal's admission as a partner in Southgate, Beal's contribution of Martel to Southgate, and Southgate's admission as a partner in Martel. At the*

1    *time of its contribution to Southgate, Martel still owned the $180.6 million worth of GNMAs. A partner's*
2    *contribution of property to a partnership generally increases the partner's outside basis in his partnership*
3    *interest. As a result, Beal took the position that his contribution of the GNMAs to Southgate had increased his*
4    *outside basis in Southgate by $180.6 million.... First, all of the interest that accrued on the GNMAs after their*
5    *contribution to Southgate was allocated to Beal. Second, in his capacity as Martel's sole manager, Beal had the*
6    *absolute right in his sole discretion to cause Martel to distribute to him the GNMAs and/or all payments received*
7    *with respect to the GNMAs. Beal's exercise of this right would not give rise to an obligation on Southgate's part*
8    *to make proportionate distributions to the other two partners. Third, Beal had unconditional rights to direct the*
9    *use and application of all proceeds from the GNMAs and to direct any and all other matters pertaining to the*
10   *GNMAs. There was a single provision that, at least theoretically, created a possibility that the other partners*
11   *might profit from the contribution of the GNMAs. If the GNMAs appreciated in value during the time they were*
12   *held in Southgate, the gain was to be allocated among Southgate's partners in accordance with their percentage*
13   *interest in the partnership.... The contribution of the GNMAs, at least in form, brought Beal's outside basis in*
14   *Southgate up to a total of about $210.5 million. When Southgate filed its 2002 partnership return, it allocated to*
15   *Beal a loss of approximately $263.5 million. The GNMA basis-build enabled Beal to claim $210.5 million of that*
16   *loss as a deduction on his 2002 individual tax return.... The FPAA concluded that Southgate was a sham*
17   *partnership that had been formed solely for the purposes of tax avoidance, determined that Southgate would not*
18   *be recognized as a partnership for federal-income-tax purposes, disallowed Southgate's claimed losses arising*
19   *out of its 2002 dispositions of Chinese NPLs, and imposed substantial penalties.... Southgate filed a petition for*
20   *review in federal district court under 26 U.S.C. § 6226(a)(2). The district court issued findings of fact and*
21   *conclusions of law after presiding over a fifteen-day bench trial. The court upheld the FPAA's disallowance of*
22   *Southgate's claimed losses on the ground that the Southgate partnership was a sham for tax purposes."*

24           This excerpt from *Southgate Master Fund, L.L.C. v. United State* identifies a "mode of operandi"

25   Beal uses for all his companies and corporations, including MGC and LNV.

26           MGC is not a "mortgage servicer" as it claims; it is instead a vehicle for investors to hide and/or

27   "launder" revenues for purposes of, at the very least, tax fraud. MGC has no interest in properly

28   accounting for borrowers payments and the ultimate goal of MGC is to take possession of the property

29   through whatever means it can use to accomplish this goal; regardless of payments. Plaintiff can produce

30   witnesses who have completely repaid their mortgages making their last and final payments to MGC,

31   even though MGC was not the originator of their mortgage.

32           When a mortgage loan is paid in full, the lender should cancel and return the mortgage

33   promissory note you signed when you took out the loan. This proves you have fulfilled the terms of the

34   loan, and that you no longer owe the lender any money. If they do not have the promissory note you

35   signed when you took out the loan then they cannot do this.

1    When these MGC customers/victims continued to complain to MGC they were sent a Notice of

2    Default and Trustee Sale instead of their canceled note. These borrowers relied on misrepresentations

3    made by MGC and LNV about the nature of their business and their standing pertaining to their Note

4    and DOT to their detriment.

5    D. Andrew Beal knows he does not have the Notes for the mortgage loans he purchases and

6    cannot legally perfect any assignment of DOT, that's why he paid mere pennies on the dollar for the

7    loan pools he purchased. LNV and Beal Bank are not "lenders" they are vehicles for high risk

8    investments. D. Andrew Beal is a renowned gambler known to have lost by some estimates $50 Million

9    in a series of high stakes poker games. (See Plaintiff's Exhibit P.) A simple Google search on "D.

10   Andrew Beal" and "poker" will result in many more articles about his propensity for high stakes

11   gambling. His business activities are simply an expansion of his affinity for gambling; only he now

12   gambles with other people's lives who can't afford to lose the money they've invested in their homes.

13   MGC does not appear to have an IRS Tax-ID number; nor does MGC appear to have a bank

14   account in its own name. Several victims of MGC's fraudulent business practices have inquired with the

15   IRS and have been told they have no record for MGC. One victim who paid MGC by check has supplied

16   the court with a copy of a returned check showing that it was deposited, unendorsed, into an account for

17   Graystone Solutions, Inc. (See Plaintiff's Exhibit I.)

18   This check was mailed to "P.O. Box 533, Medford, MA 02155-0006" the payment address on

19   MGC's statement. MGC claimed this customer missed payments. The customer disputed this claim, but

20   MGC refused to acknowledge the complaints or correct the discrepancy and instead initiated a

21   foreclosure in 2009.

22   Unable to reach MGC by phone and with no response to numerous letters, the customer drove to

23   Sudbury, MA to visit the MGC office located at "142 North Road, Suite G, Sudbury, MA 01776" as per

1    the address on mortgage statements. The office had been vacated. Outside in a dumpster were numerous

2    letters addressed to MGC. These letters contained checks and other private consumer data.

3         According to the leasing agent Cummings Properties, (781-935-8000), for the building located at

4    142 North Road, Sudbury, MA 01776, MGC never leased the office, Graystone Solutions, Inc. did.

5         The phone numbers provided to this customer for MGC were no longer valid. Even the attorney

6    representing MGC in the judicial foreclosure was unable to reach his client and withdrew MGC's

7    foreclosure complaint when the court demanded a response from his client. This MGC victim is willing

8    to testify and can provide the court with additional evidence specific to MGC's "shady business

9    practices."

10        Two MGC victims have provided this court with evidence to support Plaintiff's claim that MGC

11   apparently does not have an IRS EIN or Tax-ID number. A 2009 1098 form supplied by MGC to a

12   customer shows a question mark where the Tax-ID is typically printed. (See Plaintiff's Exhibit I page 3.)

13   In 2010 Dovenmuehle Mortgage appeared on customer 1098 forms as an alleged "sub-servicer" even

14   though Plaintiff and the other MGC victims have never found any MGC/LNV customer who made

15   payments to Dovenmuehle. (See Plaintiff's Exhibit I page 4.) Dovenmuehle appears to be used by MGC

16   as a vehicle for tax purposes and foreclosures in behalf of LNV. Certainly this is worthy of discovery.

17        MGC Mortgage has provided its customers with many different addresses. A few of these

18   addresses include, but are not limited to: "7195 Dallas Pkwy., Plano TX"; "142 North Road, Suite G,

19   Sudbury, MA 01776"; "P.O. Box 533, Medford, MA 02155-0006"; "75 Remittance Drive, Suite 6664,

20   Chicago, IL 60675-6664"; "1 Corporate Drive, Suite 360, Lake Zurich, IL 60047" which is the same

21   address used by Dovenmuehle.

22        Most of these addresses are either bogus or are actually occupied/leased by a business entity

23   other than MGC. "7195 Dallas Pkwy., Plano TX" is an EMPTY LOT. (See Plaintiff's Exhibit J pages 2

1   & 3.) The "principle place of business" address provided to the Oregon Secretary of State Corporation

2   Division for MGC's Foreign Business Registry in Oregon is "7195 Dallas Pkwy., Plano TX"; the

3   address to an empty lot. MGC's BBB rating is "F" for both the Lake Zurich and Chicago addresses. (See

4   Plaintiff's Exhibit J pages 4 & 5.) "75 Remittance Drive, Suite 6664, Chicago, IL 60675-6664" is a

5   bogus address. (See Plaintiff's Exhibit J pages 6 & 7.) MGC provides these addresses to customers for

6   payment. (See Plaintiff's Exhibit J page 8.)

7          The MGC customer/victim who provided this statement told Plaintiff that MGC told her to make

8   payments with money orders or cashier's checks; this is most likely because they are not as traceable as

9   personal checks. This victim told Plaintiff that MGC informed her they were selling her mortgage to

10  another "servicer." She made several payments to that party, then a few months later MGC told her that

11  the transaction fell through and she was to resume making payments to them; however MGC refused to

12  acknowledge the payments she made to the other servicer. She attempted to make payments while

13  working out the dispute, but MGC returned them to her and are now attempting to foreclose on her

14  property. This MGC victim is willing to testify and provide other evidence to the court regarding

15  MGC's business practices.

16         Additionally, Plaintiff can present a witness willing to testify and present evidence to the court

17  that is exceptionally incriminating. This witness is in possession of an internal memo between an

18  Attorney working directly for D. Andrew Beal and a Texas State Official regarding the volume of

19  consumer complaints against MGC; in the memo this attorney threatened the Texas State Official if he

20  exposed what he knew about MGC. Additionally this witness has a printed confirmation receipt for a

21  wire transfer for nearly $200,000 made by a Homecomings customer and payable to Homecomings

22  Financial Network, Inc. that was deposited into a personal Chase bank account for Steven Costas, an

23  individual who is named as a top executive officer for many of the companies owned by D. Andrew

1    Beal. Stephen Costas is Secretary, Vice President and Treasurer of both Beal Bank and of LNV

2    Corporation. This witness feels the need to protect his/her identity until an evidentiary hearing can be

3    held due to fear of retaliation and potential threats to his/her life. D. Andrew Beal is an exceptionally

4    powerful and influential person, especially in Texas.

5           Public information also exists to show Beal Bank is not a typical bank; and MGC is not a typical

6    Mortgage Servicer as they claim. An employee of Beal Bank posted an evaluation of Beal Bank on the

7    GlassDoor website (http://www.glassdoor.com) and claims Beal employees are given no training and in

8    four months of employment not a single customer has come to the bank. (See Plaintiff's Exhibit O.)

9           This is consistent with what Plaintiff and others have observed at Beal Bank branches. A Beal

10   Bank branch is located at 10500 SW Greenburg Rd #100, Portland, OR 97223. Plaintiff has observed

11   the bank on many occasions at different times of the day and for hours at a time. Beal Bank represents

12   itself as a deposit bank with the FDIC, but it is not like any other deposit bank. There are no customer

13   counters or tellers. Only one employee is typically at the bank and sits at a desk in a simple office.

14   Plaintiff has never observed a single customer enter the bank.

15          The employee who wrote the evaluation suggested to management that: "locally advertising your

16   rates might bring your branches some business…" Beal bank is not about customers. Beal Bank's

17   branches are only for show to give a sense of legitimacy to a sham. D. Andrew Beal's "mode of

18   operandi" identified in *Southgate Master Fund, L.L.C. v. United State* is representative of his general

19   business plan for all his "companies" and his activities.

20          The evidence attached as exhibits here is only a small fraction of the evidence Plaintiff and other

21   victims have accumulated against MGC, LNV, Beal Bank and D. Andrew Beal. The witnesses

22   mentioned here are only a handful of the victims who are willing to testify and provide this court with

1    evidence to substantiate Plaintiff's RICO and fraud claims against Defendants MGC, LNV and D.
2    Andrew Beal.

3    Each of the MGC customers/victims who have supplied this court with evidence in support of
4    Plaintiff's objection to MGC's motion to dismiss were put into fabricated defaults by false claims of
5    missed payments and are now fighting foreclosure actions brought against them by the trio MGC, LNV
6    and Dovenmuehle.

7    Additionally Plaintiff enters as Exhibit K, the Affidavit of Todd Trierweiller, an attorney and a
8    member of good standing with the Oregon Bar. Plaintiff enters as Exhibit L the letters Mr. Trierweiller
9    wrote to MGC, identified as "qualified written requests" under RESPA and a letter written by Todd to
10   Plaintiff's Congressman; who also wrote a letter to MGC. These letters show that MGC did not respond
11   to these "qualified written requests" within the 20 days required by RESPA.

12   Plaintiff enters as Exhibit M copies of the delinquent property tax notice she received in 2009
13   (property taxes were supposed to be paid through her escrow account). Plaintiff also has proof that her
14   property taxes were previously paid by EMC and Litton as per the escrow agreement on her mortgage.

15   Plaintiff enters as Exhibit Q copies of letters between Litton's attorneys and her attorney,
16   Elizabeth Lamoine, in 2006 when she proved that she had not missed any of the payments EMC had
17   claimed she'd missed in 2005. EMC's accounting of missed payments was ludicrous because they
18   claimed Plaintiff missed scattered payments throughout 2004 and 2005; no normal accounting method
19   would allow missed payments to go un-noticed for two years then all the sudden discover five missed
20   payments. These letters (and there are plenty more) tell the story in a nutshell. The bank statement at the
21   end was the only payment proof we were still awaiting to prove that Plaintiff had not missed a single
22   payment; yet Litton absolutely refused to call off the Trustee sale. Both Plaintiff's attorney and Plaintiff
23   were in shock. Captured in these communications are the fact that Plaintiff's equity was the true

1    motivation for their trustee's sale in 2006 AND it was not until November 2012, when Investigator

2    Paatalo investigated the securitization of Plaintiff's mortgage did she finally discover the full scope of

3    the fraud perpetrated on her and the key fact that shows intent to defraud; the Defendants KNEW she

4    was not in default in 2005; yet caused her extreme stress that damaged her health; cost her more than

5    $7,000 in attorney fees and forced her to file bankruptcy to prevent the sale of her home in 2006 even

6    AFTER she proved she was not in default. Plaintiff no longer had enough financial resources left after

7    that year to litigate – and back then we really didn't know what had actually happened or what to do.

8          Plaintiff herein and through these Exhibits shows the court that she has evidence to prove her

9    claims; and if the court deems she has not pled with a high enough "degree of meticulousness" to meet

10   the Rule 9 requirements; she can amend her complaint and should be allowed to do so.

11         Returning to the county records presented in MGC's request for Judicial Notice; their Exhibits

12   A, B, C and D; the assignment identified as their Exhibit D; specifically states: "After Recording Return

13   to: MGC Mortgage …." This instrument also alleges to assign the DOT to LNV Corporation; and this is

14   specified in Plaintiff's Amended Complaint. MGC and LNV are clearly a party to the fraud; as they

15   have a definitive motive of financial gain through participation in this fraud. They, and the individual

16   person, D. Andrew Beal, are the parties that caused all these false documents filed in Washington

17   County Oregon to be sent via U.S. mail since the August 2008 file dates on MGC's Exhibits B, C and D.

18         Plaintiff can provide this court with plenty of additional evidence to show that these Defendants

19   knowing commit fraud and conspire with others to commit fraud. Court records show that D. Andrew

20   Beal prepared a false document for a foreclosure action against an elderly couple more than 80 years old

21   that was used to allege that the wife had signed a promissory Note when in fact she had not. Plaintiff has

22   obtained limited Power of Attorney documents, some signed by D. Andrew Beal and his other executive

23   officers and some naming D. Andrew Beal as an "Attorney in Fact" when he is not an attorney. These

1    documents are incriminating because they show an attempt by these Defendants to give permission to an

2    assignee to create and file false documents in behalf of LVN and they also attempt to release LNV of

3    any liability of indemnity for wrongdoing.

4         Counsel for MGC cites *Yourish v. California Amplifier* in support of his dismissal when *Yourish*

5    is not similar to the case before this court. It is an action brought under the Securities and Exchange Act

6    of 1934; but in *Yourish* the Plaintiff failed to produce an amended complaint; and the court decision was

7    made "for failing to obey the court's order to file an amended complaint within sixty days."

8         Although *Desaigoudar v. Meyercord* is another securities fraud case and dismissal was granted

9    based on failure to meet Rule 9 requirements, *Desaigoudar* was not a pro-se case and unlike the case at

10   hand there was reasonable expectation by the court that an attorney would understand the requirements

11   of Rule 9 in a way that a person untrained in law and procedure would not.

12        Plaintiff was unable to locate *Fisher v. Paul Revere Ins. Group* but numerous actions have been

13   brought against "Paul Revere Ins. Group" for wrongdoing.

14        *Neubronner v. Milken* is not similar to the case at hand because in *Neubronner* the court deemed

15   that "*Before filing his present complaint, Neubronner failed five times to survive motions to dismiss.*

16   *Each time, the district court advised Neubronner of the deficiencies in his complaints and directed him*

17   *to plead his claims with greater specificity.*" This Plaintiff has amended her Complaint only once at the

18   court's request prior to any Motions to Dismiss. Also *Neubronner* was not a pro-se litigant. The Plaintiff

19   should be given opportunity to amend again if the court decides she had not meet Rule 9 requirements.

20        The requirements of Fed. R. Civ. P. 9.(b) is met when there is sufficient identification of the

21   circumstances constituting the alleged fraud for the defendant to prepare an adequate answer to the

22   allegations. *Denny v. Carey 22 Ill.72 F.R.D. 574 (E.D. Pa. 1976) (bank fraud not rigorous only*

23   *sufficient) "Motion to dismiss was denied. "Rule 9(b) of the Federal Rules of Civil Procedure was not*

1   *meant to impose a rigorous burden on the plaintiffs. In securities fraud class actions, when most of the*

2   *allegations are within the knowledge of the defendant, the plaintiff should be permitted to attempt to*

3   *prove the allegations once Rule 9(b) of the Federal Rules of Civil Procedure is satisfied. If the*

4   *allegations of fraud are sufficiently identified to give the defendant an opportunity to draft an "adequate*

5   *answer," Rule 9(b) of the Federal Rules of Civil Procedure is satisfied. Rule 9(b) was not meant to*

6   *impose a substantial burden over what is required under Rule 8. The complaint in question is adequate*

7   *under Rule 9(b) of the Federal Rules of Civil Procedure, especially because the allegations involve*

8   *information possessed by the defendant." Furthermore in Plaintiff's case before this court indisputable*

9   *evidence exists; (United States District Court Middle District of Florida Jacksonville District; United*

10  *States of America v. Lorraine Brown; case # 3:12-CR-198-J-25MLR.)* MGC, LNV and D. Andrew Beal

11  did and do, in fact, participate in such a conspiracy to defraud as Plaintiff claims in her amended

12  complaint.

13          Counsel for MGC's remaining arguments and cited memorandum of law center mostly on his

14  faulty interpretation that Plaintiff is making a claim for "wrongful foreclosure" and this is not the case,

15  so this line of argument does not pertain to the case at hand.

16          Plaintiff's claims about the securitization of her mortgage are not based on speculation or

17  theories as argued by Counsel for MGC; but on facts supported by the declaration of William J. Paatalo.

18  Counsel for MGC's arguments pertaining to the securitization and the events that would constitute an

19  incurable break in the chain of title and the events that would make a DOT void, are disputes ripe for

20  discovery and an evidentiary hearing before a jury to decide the ultimate facts. The statute of limitations

21  is not time barred – discovery of the fraud and conspiracy to defraud occurred no earlier than November

22  2011; and is well within the two year statue.

1    Plaintiff's RESPA claims have validity in that they show a pattern of callous disregard for the

2    law by MGC, LNV and D. Andrew Beal. This pattern of abuse of law and lack of response to justified

3    consumer complaints culminates into a demonstrated pattern of fraud and RICO activities by these

4    Defendants that give rise to this Plaintiff's Complaint. Plaintiff's RESPA claims are supported by the

5    Affidavit of Todd Trierweiler and by evidence supplied by other MGC victims who all experienced the

6    same lack of response from MGC.

7    Plaintiff requests the court to deny MGC's motion to dismiss in its entirety; or in the alternative

8    to grant her leave to amend her complaint to better meet Rule 9 requirements.

9    Of the MGC victims who have provided evidence in support of Plaintiff's objection to MGC's

10   motion to dismiss that support the claims she made in her Amended Complaint pertaining to fraud

11   conspiracy and RICO, one is African American, three are more than 65 years old, and three are female

12   heads of household. Furthermore the American Civil Liberties Union ("ACLU") has brought a class

13   action in behalf of a class of African American homeowners in Detroit, *Adkins et al. vs. Morgan Stanley*

14   in the United States District Court for the Southern District of the New York.

15   This Plaintiff's claims pertaining to discrimination in the origination of mortgages is very similar

16   to the claims the ACLU make in their Complaint. These victims, like the Plaintiff, were intentionally

17   and discriminatively targeted for exceptionally predatory loans and for default at loan origination.

18   This was calculated with intent by the origination parties, including those named as Defendants

19   in Plaintiff's Amended Complaint. Most such targeted borrowers, as expected and as planned by these

20   Defendants, did by their own actions fall into default on their loans.

21   However, a select few like Plaintiff and the other victims, who ended up with MGC, LNV and D.

22   Andrew Beal through a series of fraudulent events, did not of their own accord default on their loans.

23   Instead false claims of default were made against them, either by MGC or a predecessor to MGC and

1    then used as a basis to initiate fraudulent foreclosures. In Plaintiff's case, at least, the immediate gain of

2    her equity, which at the time was valued in excess of $160,000 was motive enough to falsely confiscate

3    her property, rather than allow her to continue making payments which would result in a less immediate

4    financial gain for the Defendants.

5          Most of the MGC victims who have provided evidence to this court in support of Plaintiff's

6    objection to MGC's motion to dismiss that support the claims she made in her Amended Complaint

7    pertaining to fraud conspiracy and RICO, and who were senior citizens, like Plaintiff, had considerable

8    equity in their homes. They are at an age when they cannot ever recover the losses they have suffered

9    from this fraud perpetrated against them.

10         These Defendants, including MGC, LNV and D. Andrew Beal, prey on the most vulnerable in

11   our society. Ultimately we each must answer to a higher Law. Jesus said, "Truly, I say to you, as you did

12   it to one of the least of these my brothers, you did it to me." *Matthew 25:40.*

13         Counsel for MGC may argue that this is a conclusory allegation, but the Judeo-Christian roots of

14   America's founding ideas is well grounded in our great Constitution: "We, therefore, the representatives

15   of the United States of America, in General Congress assembled, appealing to the Supreme Judge of the

16   world for the rectitude of our intentions, do, in the name, and by authority of the good people of these

17   colonies, solemnly publish and declare that these United Colonies are, and of right ought to be, free and

18   independent states; .. And for the support of this declaration, with a firm reliance on the protection of

19   divine Providence, we mutually pledge to each other our lives, our fortunes, and our sacred honor."

20   (*Declaration of Independence. See also John Eidsmoe, Christianity and the Constitution, Baker Book*

21   *House, Grand Rapids, MI, 1987, pp. 355-377*)

22         The world looks on our great country for guidance; and when the American people and the

23   peoples of other nations see our courts rewarding corporate greed and corruption and see that our

---

1    government fails to prosecute those who commit white collar crimes because they are rich and powerful;

2    then our great nation is on the brink of disaster. Jesus chased the money changers out of the temple;

3    these wealthy corporate Defendants and the men who control them, also named Defendants in the

4    Complaint before this court, are the money changers of our time. They corrupt our government and our

5    courts with their excessive ill-gotten wealth. They exist only for the acquisition of wealth and put

6    nothing before this objective; money has become their God. As with ancient Babylon, God will turn

7    away from a corrupt people. And in each decision any one of us makes we choose to take a step closer to

8    God or a step further away from God.

9        Plaintiff respectfully requests this court to deny MGC's Motion to Dismiss in its entirety.

10

11

12

13

14   Denise Subramaniam